IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | Case No. 3:15-cr-00369-JO |
| v. | ) | |
| | ) | Findings of Fact and Conclusions of Law |
| Raul Alvarado et al. | ) | |
| Defendants. | ) | |

Jones, J.

In March, 2016, a federal grand jury indicted Raul Alvarado ("Alvarado"), Fidel Villafana-Beltran ("Villafana"), and Raechel Amis with Conspiracy to Distribute Controlled Substances, Heroin and Methamphetamine. [# 35] Thereafter, both Alvarado and Villafana filed motions to suppress evidence seized during a February 12, 2015 traffic stop of a SUVAlvarado was driving and in which Villafana was a passenger. [# 67, 91] In their motions, Alvarado and Villfana request a ruling suppressing any observations of them by the police, any statements made by them along with any physical evidence seized at that time of the traffic stop. Based on the following findings of facts and conclusions of law, I DENY defendants' motions.

**Findings of Facts**

On the evening of February 12, 2015, Officer Nolan Borders ("Borders") of the Rainier Police Department (RPD) observed a male and female arguing outside the Bridgeview Deli in rural Columbia County, Oregon. Borders pulled off the road and watched the female walk into the deli and the male walk to a SUV parked nearby, get in the driver's seat, back out of the

parking space and drive toward Borders on Washington Way. Borders noticed that the SUV was parked in a marked handicap zone. The SUV turned onto an access road toward a gas station and Borders noted the absence of a disabled persons parking permit hanging from the rearview mirror.

Borders followed the SUV into the gas station and at 11:13 p.m. Borders parked behind the SUV, allowing room for it to leave either by driving forward or in reverse. Borders approached the driver, Alvarado, who had walked to the carwash coin machine. Borders identified himself as a RPD officer and informed Alvarado that he had parked in a handicapped parking space at the deli and asked if Alvarado had a permit. Alvarado claimed that he did and Borders asked to see it. Borders saw there were two other men in the SUV. Alvarado opened the front door on the passenger side where defendant Villafana sat. Alvarado looked for the permit in the glove box while speaking Spanish with the two passengers. Borders noticed a police scanner in the SUV and realized the passengers were listening to the same channel used by Borders for police communications.

Alvarado did not find the permit and told Border that the permit belonged to his mother. Borders believed he had probable cause that Alvardo had parked unlawfully because the actual holder of the disabled persons parking permit must be in the car with Alvarado for the permit to be used validly.[1] Borders got Alvarado's driver's license and told him to stay with his SUV while Borders went back to his cruiser.

After seeing the police scanner, Borders felt concern for his safety. The closest backup officer was twelve miles away, and he was outnumbered three to one. The two passengers in the vehicle conversed with Alvarado in a language Borders did not understand. At 11:15 pm, he

---

[1] Parking in a handicapped zone without proper authorization is a Class C traffic violation. Or. Rev. Stat. § 811.615.

2 Findings of Fact and Conclusions of Law

radioed Dispatch about the police scanner and requested back up. In addition, when Borders looked at Alvarado's license, he recognized the name. Approximately one month prior to this encounter, he was asked to conduct a welfare check on a female who was allegedly assaulted by Alvarado. Before Borders was able to conduct the welfare check, he learned of an officer safety concern because Alvarado had stated that he would kill police officers if confronted by them. Borders also knew that Alvarado was a suspect in a federal drug conspiracy investigation. At 11:17 pm, he requested additional back up. At 11:22 pm, Borders requested a computer check of Alvarado's driver's license.

Initially, Dispatch was unable to locate Alvarado's name based on the Washington State driver's license Alvarado provided. After Border's provided additional information including the license plate numbers from the SUV Alvarado was driving, Dispatch responded at 11:31 pm that Alvarado had an outstanding misdemeanor warrant.

Four additional back up officers arrived and at 11:32 p.m., Borders advised Alvarado that he was under arrest based on the warrant. While another officer placed "stop sticks" in front of Alvarado's car, Borders handcuffed and patted down Alvarado before formally arresting him at 11:37 p.m. Following Alvarado's formal arrest, Borders read him his Miranda rights and searched him, finding $3950 in cash on his person. He then placed Alvarado in the back of a State Trooper's car and answered questions posed by Alvarado.

Just before midnight, Borders turned his attention to the passengers in the vehicle. He directed the front seat passenger, who provided Borders with a Mexican ID listing his name as Luis Antonio Rico Carrillo, but whose true name is Fidel Villafana-Beltran, to exit the SUV. Borders asked Villafana if he had any weapons and if Borders could pat him down to check for weapons. Villafana said he did not have any weapons but agreed to the pat down for weapons.

3 Findings of Fact and Conclusions of Law

Borders did not find anything consistent with weapons in his pat down, but did find what he believed to be a stack of cash inside Villafana's jacket. Borders asked to look at the cash. Villafana consented and Borders took the cash from the jacket. He asked Villafana how much money it was and Villafana responded that he did not know. Borders asked if he could count the money and Villafana agreed to this. Borders counted the money, gave it to the other officers to recount for accuracy, and determined there was $11,000. Villafana explained the money was the proceeds from the sale of a car and that $8500 belonged to him and $2500 belonged to Alvarado.

Once the officers removed the third passenger, Borders asked Alvarado if he could search the vehicle. Alvarado refused. The officers approached the car with weapons drawn, some of the officers had long guns. Borders asked one of the backup officers to run his narcotics detection K9 around the vehicle's exterior. The K9 did not alert positively to the exterior of the vehicle, but when Borders placed Villafana's bundle of cash on the ground, the K9 positively alerted to the presence of drug odor on the cash. Based on the positive alert, Borders seized the $11,000 as evidence of drug trafficking.

Borders transported Alvarado to the Columbia County Jail. Villafana was not arrested and was allowed to leave the scene of the encounter.

## Conclusions of Law

1. Borders had probable cause to believe that a traffic infraction had occurred.

ORS § 811.615(1) states that a person commits a traffic infraction if the person parks in a space reserved for people with disabilities without conspicuously displaying a disabled person parking permit. Borders personally observed Alvarado's SUV parked in a spot designated for handicapped parking. He did not see a handicapped parking permit displayed on Alvarado's vehicle. When he asked Alvarado if he had a disabled person's parking permit, Alvarado was

4 Findings of Fact and Conclusions of Law

Case 3:15-cr-00369-JO    Document 125    Filed 10/07/16    Page 5 of 7

unable to provide one. Thus, Borders's stop of Alvarado's vehicle was lawful.

> 2. Borders's traffic stop of Alvarado and the passengers inside Alvarado's SUV did not exceed the time needed to handle the matter for which the stop was made.

In *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609 (2015), the Supreme Court examined the duration of police inquiries in the traffic- stop context. The Court held that a police stop that exceeds the time necessary to handle the mission for which the stop is made violates the Fourth Amendment's shield against unreasonable seizures. *Rodriguez*, 135 S. Ct. at 1616. The Court recognized that beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquires incident to the traffic stop, such as "determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez*, 135 S. Ct. at 1615. The court also noted that officer safety interests stem from the mission of the stop. *Rodriguez*, 135 S. Ct. at 1616.

Here, when Borders first encountered Alvarado, his mission was to issue a traffic citation. When Borders observed the police scanner and determined that he was outnumbered, he called for backup. The time taken by Borders to make that call and to contact Dispatch for background information about Alvarado was necessary to complete the mission safely. After Dispatch informed Borders as to Alvarado's outstanding warrant, Borders's mission evolved to include arresting Alvarado on the outstanding warrant. The time required to complete the mission expanded with the change in the mission. Once Alvarado was arrested and placed in the patrol car, Borders had to deal safely with the remaining passengers and the now driverless SUV. Borders directed Villfana to get out of the SUV. He asked Villafana if he could search him for weapons and Villafana consented. The mission was complete when Alvarado was arrested and placed in the officers car, the remaining passengers were removed from the SUV and the SUV safely secured. There was no idle time. All of Borders acts involved efficiently performing his

5  Findings of Fact and Conclusions of Law

duties.

        3. Looking at the totality of the circumstances, Villafana's consent to search was voluntary.

"For the duration of a traffic stop, a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." *Brendlin v. California*, 551 U.S. 249, 255 (2007). "An officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). An officer may search without a warrant and without probable cause if given voluntary consent. See *Schneckloth v. Bustamonte*, 412 U.S. 218 (1972; *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). To determine whether consent was voluntary, courts look at the totality of the circumstances, *Schneckloth*, 412 U.S. at 227. A court should consider five non-exclusive factors in determining whether consent was voluntary, specifically (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained. *United States v. Cormier*, 220 F.3d 1103 ((9th Cir. 2000).

Here, Villafana was not in custody when Borders asked for consent to search. While Borders provided directions to Villafana as to how and where to stand as Villafana was getting out of the SUV, there is no evidence that Villafana was being threatened with the prospect of arrest. Next, while officers with weapons, including long guns, were present on the scene, there is no evidence that officers had weapons draw at the time Villafana was asked for and gave his consent. Third, no Miranda warnings were given to Villafana because he was not in custody when he consented to the pat down. Finally, no officer informed Villafana that he had a right not to consent nor was there any discussion of a search warrant. However, the absence of Miranda warnings and the lack of discussion regarding the right not to consent and search warrants are of

6 Findings of Fact and Conclusions of Law

no import here. Villafana immediately consented when Borders asked if he could conduct a pat-down. In fact, Villafana gave consent three different times in rapid succession: when Borders asked if could perform a pat-down for weapons; when Borders asked if he could take the money out of Villfana's jacket; and when Borders asked if he could count the money. Borders lawfully seized the bundle of money after the K9 unit positively alerted to the bundle of money.

Based on the foregoing reasons, I DENY defendants' motions to suppress [# 67, 91]

Dated this 7t day of October, 2016

                                        Robert E. Jones, Senior District Court Judge